Next case this morning is Lodge No.5 of the FOP. v. City of Phila. Next case this morning is Lodge No.5 of the FOPP. Right on the strict scrutiny issue. Back to the pre-ban activity, shall we say. Does not the Colorado Republican case undercut your position therein that such bans can be based upon historical data? Well, they can be based on historical data that still have some relevance. But where courts cite something that happened in 1917 as justification for a freeze on speech in 2013, I most respectfully suggest that NTU, the standard of NTU, which is laid out in a brief ad nauseum, requires real harm, requires them to show how this particular ban is in fact going to affect the government. There's not a shred, not a scintilla of evidence in this record indicating that fact. None. The courts reliance on a dozen newspaper articles that there's corruption in the police department subsequent to 1950. Read the articles. It has nothing to do with political corruption. It's a dirty cop. And that happens. But they also had dirty politicians and they had dirty judges. Because there was two bad judges in Luzerne County, what inference do you draw from that? Nothing. I'm going to ask Ms. Kaversky to put five minutes on the clock. We're going to add five minutes. Let me go back to something that Judge Hardiman talked about before, which in Citizens United, which was decided just a few years ago, the court said we have consistently approved laws that bar government employees, but not others, from contributing to or participating in political activities. Isn't that, I mean it was dictative, but obviously isn't that a pretty strong signal from the court that these bans on political contributions are still okay constitutionally? Where there's facts to substantiate them. The facts in this case, the reason the police were included in this particular prohibition is found on page 155 of the record. The expert that they retained and the reason that police were included in the contribution ban was because of their control of the voting areas. That is in fact the reason. Their own evidence says, page 155, that's the reason. Nothing else. All the rest of this has just come out of thin air. The expert says the reason they were included was because the police officers were in fact bullying people at voting areas. Well, we all know that doesn't happen anymore. If you wanted someone to protect and serve you, you had to call the ward leader, not the local police station. Wasn't that on the record as well? Unquestionably, that was then and this is now. Unquestionably, that was an entirely different world, Your Honor, and I don't for a moment suggest that it wasn't that way. That was 1950. That was before civil service. That was before Act 111 bargaining. That was before, indeed, we had control of the political system through the ethics board. It's a heavily regulated system now. And the best evidence is, where is the proof? Where is a single example, just one, since 1950 to justify freezing the free speech rights of 6,500 police officers? And that's what the issue in this case is. And if that is, that is indeed the issue. Where is the evidence to justify? You're going to rely on something from 1850 to 1950 that incidentally was massively changed by legislation subsequent to 1950 and has created a world that bears no reasonable resemblance to the world prior to 1950, including the political party that's in control. Mr. Jennings, you didn't discuss the Reeder case or the Pollard case in your brief, both of those upheld contribution bans against police. Can you distinguish those or do we have to just rule contrary to those? No, no. Again, my belief is that in both of those cases we were looking at the facts. In both of those cases, you have to look at the facts. And incidentally, neither of those cases discussed, well, Schwartzwelder. Schwartzwelder in this circuit is the law as far as I know. It was this circuit that said that this is the standard, NTEU is the standard to be applied. NTEU requires proof that they did not discuss Schwartzwelder. And clearly, there is no question that you apply the letter carriers, you apply the, well, it was always that way, therefore, we're just going to pretend that it's still that way kind of theory. There's no question about that. However, this circuit takes a more practical point of view and says, show me. Show me where it's that way. You have to come forward with evidence showing to justify freezing the free speech rights of police officers. If you can, fine. If you can't, if you can, fine. But in this case, the district court just simply said nothing. I mean, it said nothing. It cited no evidence. It cited a 1917 incident in the city of Philadelphia and said, geez, if it was that way then, it's maybe that way now. I'm just not sure I understand how you're relying on the evidence in Pollard and Reeder because those cases were decided in the 80s. And the reforms there were in response to the Pendergast machine in St. Louis. Well, that was in the 30s and 40s. And the cases were decided in the 80s. So where's the evidence of contemporaneous corruption that you claim to require here? My recollection of Pollard and Reeder was that the application of the facts was not in dispute as it is here. It was never in dispute. They just simply tacked the policy. They did not say, wait a second, this makes no sense. This simply makes no sense to continue, particularly in light of NTU, this simply makes no sense to continue freezing the rights of people. They, in fact, just simply attacked the policy and said it's time for the policy to go. They also, as I recall, and I just double checked, they also preceded NTU, which obviously puts a whole different light on what's required to justify these types, according to Schwarzweiler, these types of general bans. All right.  Thank you. Thank you very much. Ms. Ewing? Ms. Kaversky, would you put 20 minutes on for Ms. Ewing, please? Thank you. May it please the Court, Eleanor Ewing, City of Philadelphia Law Department, on behalf of the city. Thank you. All the things that Mr. Jennings is saying about times have changed and the world is a different place, these could be said about the Hatch Act as well. If you look at letter carriers, its predecessor case, Mitchell, and even going back to Ex parte Curtis back in the 1800s, the interest, and I think in letter carriers the Supreme Court talks about the judgment of history, is that it is valid to make a legislative decision to that government workforce has to be shielded from political influences and that the choice of the arrows and the quiver to do that, so to speak, should be for the legislature to determine. There is also case law, I think, in reader of the court. So contemporaneous, excuse me. Sure. So contemporaneous harm is not an issue in this matter? Well, contemporaneous harm, I guess, is, again, when you look at letter carriers, the court identifies three different types of interests, and these interests are things that have been really don't change, or if they do it's for the legislature to determine that they have. Those are whether there is partisanship in the administration of justice, particularly when we're talking about police, whether there is the perception that one's police department is free from political influences, and then there are employee protection of employee interest. But there are other provisions of the charter that deal with protections of employee interest. Are there not? Just like the Hatch Act did, there are a variety of provisions that the charter, the people who developed the charter and put it to the electorate for a vote, they determined that these made sense and these don't. Is it clear that we're under letter carriers? I think we are, because letter carriers is applicable to this particular type of speech and these particular type of activities. So what do we do with NTEU? We disregard that? No. And I think NTEU can be reconciled and interpreted consistently, but letter carriers deals with this particular type of speech and conduct. When you get to NTEU and the court takes pains because they are faced with the argument, well, what about letter carriers? Is this somehow inconsistent because we didn't have some sort of very specific evidence in the Hatch Act? Are you intending to overturn the Hatch Act? And the court in NTEU says, no, we recognize letter carriers and that is good law. So I think to interpret, to harmonize those two tests, and I think the district court did this very well, you have to look at what each side of that balance means. They're both balancing tests. And NTEU certainly was not dealing with political activities and nor was Schwarzweiler. They were dealing with pure speech of various kinds as opposed to the political contributions, which there is entire lines of case law saying that this is a marginal type of speech, which is actually less protected and entitled to less deference. It's sort of like speech by proxy. I'm giving money so that candidate Smith can speak. I'm only making a sort of a general, you know, I support him, but he's the one who's really going to be able to speak. So under the ethics rules, a police officer could write a very compelling op-ed to the inquirer, correct? As long as he or she doesn't identify themselves as a police officer. Yes, if they're saying I am John Smith and I support candidate Jones for all these reasons. And that's less influential than a $50 contribution to their PAC? It's hard to determine what is influential in what respect. If the officer is saying he's not identifying himself as being part of the city in any way, and he is simply submitting a letter to the inquirer, then it doesn't seem to plug into any of the interests that the government employer really is that concerned about. But when you're dealing with the political contributions, particularly those that are flowing through and being aggregated in the workplace, then I think there is more of a problem. Why do you say in the workplace? Well, I mean, as Mr. Jennings said, everybody other than the commissioner and the deputy commissioner are FOP members probably, or at least they're civil servants. And, you know, it may not be that a lot of the same even subtle type of pressures that I'm a new recruit and my sergeant thinks that this is a terrific idea that we all contribute to COPAC. I mean, that's the same as – Well, I thought there's a prohibition on soliciting, though. Well, he doesn't have to say I'm collecting, I'm passing the hat at the workplace, but he can talk about how wonderful COPAC is. And shouldn't we all do this? And I want to please my sergeant because I want him to know – But why is there any compulsion there? I mean, I'm not sure I understand the coercive aspect to that. I think when the case is really you're talking about not, you know, not hammer type of coercion, but more of just subtle degrees of I want to be – I want to please, I want to be with the plan, I want to be one of the company guys. I thought your best argument for coercion was the checkoff aspect. Well, that's the way it's being done. And in which case I would ask why doesn't the city just eliminate the checkoff? There's certainly no constitutional right to have an automatic payroll deduction. That's correct. So why doesn't the city just eliminate that if you're truly concerned about these officers being coerced? Well, I mean, that's – They would have to let them go home to their families or themselves and then make a decision whether they want to send in a check. That's quite different than having a superior stick a form in your face or look over your shoulder when you have to decide whether to check off an automatic payroll deduction, is it not? It's one of the interests, but it's not all of the interest. And I think that you can address – you might be able to address one part of things with one other. I mean, you know, the whole thing is a package that the drafters of the charter felt was necessary. And the charter can be changed. It's a living document. It's like the city's constitution, but it can be changed by either – there are two ways. Either the 20,000 citizens can submit a petition to city council, and city council then puts it on the ballot, or city council can initiate it itself. And they can say, hey, we think maybe we should rebalance this stuff. It's time to – it's time that we – maybe we just need this and not that. But they haven't done this. What they've done instead is to say the courts should pick and choose and say this one is no longer necessary. And I think it's a matter not only for – I'm not sure you're giving them enough credit. I mean, as I understand their argument, they're saying this implicates their First Amendment rights, so there's an important constitutional interest on their side of the ledger. They acknowledge – No question. That the city has an important interest in having a professionalized, apolitical police force. Okay. So we're – we have the difficult task of balancing those two. Right. So, you know, where's the evidence? Do you disagree with Mr. Jennings' argument that the police is apolitical – the force is apolitical, that it's a different world? Do you disagree with that? Do you – There – is it a different world? I don't – I mean, let me be – I mean, it's not 1800. Let me be more specific. I was – I was personally underwhelmed by your evidence of corruption because in every instance that you cited, those were criminal acts. Those were rogue acts of individuals that just didn't seem to me to be political in nature. Am I – did I misread the record? Is there a political problem to which you can cite that would cause this court to override some of the significant employee protections, such as civil service protection, such as collective bargaining, such as, for example, the fact that the rights privilege distinction in McAuliffe is no longer the law? In the McAuliffe era, you know, police – they better tow the party line or they're going to get fired, right? There is – We're in a polar opposite situation today than in that world, are we not? Well, there is some – there is some more protection. I mean, there were civil service laws even before the charter provisions. There are stronger civil service laws today. There is some protection, but as we say in our brief, these protections help in some ways and they don't help in others. For example, what Mr. Jennings is talking about, if you have a – if you can have an individual who can bring some evidence that there was political influence in his hiring decision or firing decision or something, then great, you have a remedy. But your – that only deals with protecting the employees, first of all, rather than the interest of the public, and it only catches the ones where you have a strong case. There are – and some of the other cases have talked about promotions, for example. I mean, even with – Mr. Jennings talks about how things are done so strictly by test, but there's always – there's the rule of two comes into play. There's always a choice at the end of the line of a number of these things, whether you pick A or B. And then maybe he gets another shot, you pick B. And then do you pick A or C? And you can pick C. So there's always an opportunity for there to be some sort of influence at play so that Mr. A never gets picked. I mean, it's not done totally by test and would he be able to prove this? Would he be able to get a remedy? I don't know. Did the district court adequately treat these issues that Mr. Jennings raised, the collective bargaining agreement and civil service protections that were put into place post-1950? I don't know that the district court spent a lot of time talking about the civil service law and the Act 111, Judge Nygaard, but I don't know that he really had to because I'm so sorry. I have more hair than he does. But he's smarter than I am. I'm not – what the judge said, I would like to – I was struck by this when I was preparing, was, and I think that the case law reflects this to a great degree, is that the history of corruption in the city provides the specific evidence that there is a concrete danger of corruption and that corruption in whatever form can reemerge. No question, all of that is true. And that that provides the specificity that NTU speaks about. But early on, we asked whether you have – what kind of a burden you have to show that there's a continuing harm here, or is it just a conjectural projection based obviously on human nature and past history, but how far back do we change? You seem to be saying that this has got to be a legislative decision and we simply have to defer because there's the potential there for regression in this matter. The real history is what distinguishes it from being conjectural. That provides that there has been a history that gives a reasonable basis for an assumption that Philadelphia is not an angelic place where all will be peace and love if this is removed. I think also if you look at the political contribution cases in particular, the ones that don't even have to do with employees per se, but they are the cases that have to grapple with the rationale of corruption. And there are a number of the cases. There's one in the Second Circuit, Akhnebeni, which talks about do we have to give – do we have to wait for corruption to reemerge and then say, okay, this was working well, we have to lift it. But what's the – I'm sorry. What about the example of the firefighters in the last 10 years? Have there been evidences or evidence of political corruption? I'm not aware of that, but the police – And is that significant or are they just have such a different job? I think they have a different job. And a different vulnerability than police officers have. I mean, the firefighters case was never – by its terms was never intended to – it didn't look at the situation of police officers at all. It was looking at maybe whether firefighters had some role in doing inspections, but that the contact with the public and the law enforcement aspect and the fact that there was discretion and that the police are the embodiment of force and they have decisions to make with citizens and discretion, none of that's involved in the firefighters case. That's not what they thought in the charter. They treated the firefighters and the police equally. At that time – I mean, at that time, there may have been more of the uniformed forces acting as a whole, but certainly police are a lot different than firefighters now. So times change, circumstances change, your decision not to appeal the firefighters decision by the Eastern District would seem to be something we can consider then. You know, there are any number of reasons not to appeal a case, and I wasn't involved in any of that, and I might have appealed the case. I mean, who knows? But there is – don't you conceive, Ms. Ewing, there is an equity aspect here? I mean, let's accept your version of the politicization of public employees in Philadelphia. As I understand the landscape at present, all kinds of AFSCME members, the other union members that work in city government, the firefighters, they can be very politically active through their PACs. They can – they have a seat at the table when it comes to influencing the folks that have a say over how much they're going to be paid and what their overtime rights are, et cetera, et cetera. So the police are at a distinct disadvantage vis-à-vis all of their fellow municipal workers, are they not? Police have always traditionally been subject to different and more restrictions, no matter what arena. Not always. In 51 Charter, the firefighters and the police were treated identically, with respect to this political contribution ban, correct? At that point, but certainly the police were always treated more restrictively than the water department or the streets department or whatever, and as recently as this court in the Gwynn case talked about how police are – the public has to have a total confidence in their integrity and they have to be subject to more oversight and more control and more – And from 1919 to 1951, there was evidence that there was an utter or a systemic lack of integrity in the police force, correct? Correct. And during that time, contributions were banned. Well, there was civil service, too. So what's the nexus? Let's assume that we are fully with you about the evils to be avoided, not returning back to these troubled times. What is the nexus between this contribution ban and the evils sought to be avoided in light of the fact that the evils occurred while the ban was in place? The ban and – obviously, there was still a problem, and the city fathers looked at what needed to be done, and perhaps I don't know exactly how – what all the different measures in place, control, curbing, political activities were compared to 1951 and just prior to 1951, but clearly some strengthening, and again, I think you have to look at things as a package and then see. After 1951, Mr. Jennings seems to say, no problem. Obviously, this package worked. Now he is pulling apart part of the package and saying, well, this part we don't want. All of the package infringes on government employees' First Amendment rights, and it's not that the city is underestimating those or being blithe about them, but there are interests that the city feels, and particularly in the case of police officers as being that kind of last line where you need to be absolutely sure of their integrity, where you want to be very cautious about moving away from that, and if the voters want to do that, they have a method. There seems to be a gap here between stating certain principles, some of them based on historical experience and current evidence, and you seem to be relying more on the former rather than the latter. Am I correct about that? On recent experience versus the past? Yes. I think the past provides the basis for believing that there is still a present danger. Mr. Glaser, the then-chair of the Ethics Board, he submitted an affidavit in which he stated that he felt that there was still the possible issues with police supporting judges, and these contributions that COPEC has made in the past, these are directly to city-type offices. They're to people running for common police judge, for a city council, for the mayor, for state rep, but they're very local type of offices, and that there was a possibility certainly for actual politicization, and also certainly for the appearance to grow and the impression to grow among the public that the police somehow were able to have an inside track with the city officials and the judiciary. I think we covered most of what I wanted to address. I would point the court to the political contributions cases because they're already, if you have some, you have a, that would be one side of the balance, and you are already allowed to restrict that even with the general public, and then you get to looking at the time-honored basis for government employee, that the government as employer has a further interest. And also, I don't know whether, I know in the reply brief of the union, they relied on the Shelby case, and I don't know whether the court has any questions about that. I found it distinguishable. That was fairly sui generis, I think. And that was something. We can study the brief on that. Okay, I thought, well, that that was, does the court desire a brief on that, or? Yeah. Okay. So, I mean, in conclusion, I think you know our position. It is part of the Hatch Act arsenal. It's controlled by the Hatch Act cases. I don't think NTEU is contrary to that, and I think that where we're dealing with corruption and the interest involved in the Hatch Act, that you don't need to be generally re-examining the law and the basis for the law when, as the unions conceded in its brief, there was a good basis for the passage of the law. Letter carriers also, you know, they looked at the law 40 years after Mitchell and had no problem in reaffirming it.  Thank you, Ms. Ewing. Mr. Jennings, rebuttal. Very briefly. When I sat down, I realized we did not cite Reeder and Pollard in our brief, but I apologize. We did cite it below in our brief below and to the footnote, and the brief is part of the record. But when I looked at the footnote, I remembered what it was about. Reeder and Pollard were both discipline cases, not prior restraint cases. There the police officers were fired. Well, they lost their jobs, yeah. They were fired. So now when you fast forward 30 years. How does that help you? The firings were upheld. How it helps me is that the standard you apply, according to Schwarzwalder again, is that you have a broad prohibition versus individual action. That's exactly what Schwarzwalder said is the reason to apply NTEU. That's this court's decision in Schwarzwalder, that's exactly why it said to do it. You look at the circumstances. Here, I mean, they're clearly distinguished. Also additionally, I would point out, they're prior to NTEU. So courts obviously didn't have the benefit of thinking of the Supreme Court's decision in NTEU. Just a few other things. The letter in the newspaper, I don't believe that an officer can do that, even not identifying himself. If you just take a look at page 398 of the record, which is the rules and regulations of the Ethics Board, it says any activity on behalf of, to advance the interest of a candidate. It doesn't say as an officer or identifying yourself an officer, it's a flat prohibition. I don't believe, I mean, that's not an issue in this case, but I don't believe that that is accurate. Would that apply, though, to support for candidates for common pleas, judges, or ministers? Yeah, political, because it's a political party. I believe it would, Your Honor. One other thing, I'm running out of time. Thank you very much for your attention. Thank you, Mr. Jennings. Thank you to both counsel. The case was very well briefed and argued, and the court will take the matter under advisement.